| | | |
|---|---|---|
| STATE OF LOUISIANA | * | NO. 2022-K-0267 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| CHARLES MONROE | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 536-591, SECTION "DIVISION D"
Judge Kimya M. Holmes,
* * * * * *
**Pro Tempore Judge Madeline Jasmine**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Paula A. Brown, Pro Tempore Judge Madeline Jasmine)

G. Benjamin Cohen
Assistant District Attorney
Jason Williams
District Attorney
PARISH OF ORLEANS
619 S. White Street
New Orleans, Louisiana 70119

COUNSEL FOR STATE OF LOUISIANA/RESPONDENT

Jennifer L. Hull
Orleans Public Defenders Conflict Division
2601 Tulane Avenue, Suite 700
New Orleans, Louisiana 70119

COUNSEL FOR DEFENDANT/RELATOR

**WRIT GRANTED; RELIEF DENIED**
**MAY 11, 2022**

*MJ*
*TFL*
*PB*

Relator Charles Monroe seeks review of the trial court's March 24, 2022 ruling denying his motion to quash the bill of indictment. For the reasons that follow, the writ is granted and relief is denied.

## *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On March 19, 2019, a jury, in a ten to two vote, found Mr. Monroe guilty of second degree murder but unanimously found Mr. Monroe not guilty of obstruction of justice. This Court affirmed his conviction in February 2020. *See State v. Monroe*, 19-1014 (La. App. 4 Cir. 2/19/20), 293 So.3d 60. During the pendency of Mr. Monroe's writ to the Louisiana Supreme Court, the United States Supreme Court issued its ruling in *Ramos v. Louisiana*, 590 U.S. ___, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), holding non-unanimous jury verdicts in state felony cases to be unconstitutional. The Louisiana Supreme Court remanded Mr. Monroe's case to this Court in light of *Ramos*, and this Court vacated his conviction and sentence for second degree murder and remanded the matter to the trial court for further proceedings. *State v. Monroe*, 19-1014 (La. App. 4 Cir.

1

7/1/20) 302 So.3d 557.  In February 2022, Mr. Monroe filed his motion to quash the bill of indictment based on double jeopardy and collateral estoppel, which the trial court denied.[1]

## DISCUSSION

On supervisory review, Mr. Monroe avers that because the jury did not find that Mr. Monroe had fled the scene with the murder weapon, the jury necessarily could not find that Mr. Monroe was at the scene of the crime. In that his presence at the scene of the crime would be necessary to prove he committed murder, Mr. Monroe argues, that the bill of indictment charging him with second degree murder should be quashed.

In support, Mr. Monroe relies on *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970), wherein the Court explained:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

In *Ashe*, the petitioner was originally tried for robbing one of six poker players. As the Court explained, the evidence that a robbery had taken place was strong; "[t]he proof that an armed robbery had occurred and that personal property had been taken from [the victim] as well as from [three of his fellow poker players] was unassailable." *Id.,* 397 U.S. at 438, 90 S.Ct. at 1191.  However, the "evidence that the petitioner had been one of the robbers was weak."[2]  The jury found the

---

[1] At the hearing on the motion to quash, Mr. Monroe abandoned his double jeopardy argument as a basis for quashing the bill of indictment and instead presented argument based on collateral estoppel.

[2] The Court explained that only one of the poker players who testified at trial identified the petitioner as one of the robbers, "but only by his 'size and height, and his actions.'" *Id.*

petitioner "not guilty due to insufficient evidence." *Id.,* 397 U.S. at 439, 90 S.Ct. at 1192.

The United States Supreme Court found that the State was collaterally estopped from trying the petitioner a second time, reasoning:

> [T]he record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that [the victim] had not been [robbed]. The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery of [a second robbery victim] wholly impermissible.

*Id.,* 397 U.S. at 445, 90 S. Ct. at 1195.

Here, the murder took place at a convenience store. The investigating detective obtained a still frame photograph from the surveillance footage which depicted the shooter. The photograph was disseminated to fellow officers, and the investigating officer received a reply from Sergeant Charles Love ("Love"), who stated that he knew the person in the photograph and identified him as "Charlie Monroe."

At trial, Love described Mr. Monroe as "a family friend." He stated that he had known Mr. Monroe for nine to ten years and estimated that he saw him on a weekly basis. Love stated that Mr. Monroe had served as a confidential informant on occasion and that he had a close relationship with him.

Upon viewing the photograph that was disseminated, Love immediately notified his lieutenant that he knew the perpetrator. Love testified that he was one hundred percent certain that the person in the photograph was Mr. Monroe. Love acknowledged that in the photograph, one cannot see the entirety of Mr. Monroe's face because there was a white rag on top of his head and he was biting the top of his shirt. However, despite these deficiencies in the photograph, Love reiterated

3

that he was one hundred percent sure of his identification. Love stated that he was able to see that it was Mr. Monroe by observing his nose, mouth and eyes. Specifically, Love explained that Mr. Monroe's nose was distinguishable because it "flares out" and he recognized the eyes "because of the slant."

Love's identification of Mr. Monroe was not based on the surveillance video reflecting the shooter fleeing the scene. There was no testimony provided by a witness based on the video footage. Instead, it was based on a still photograph taken from the video footage reflecting the suspect at the scene of the murder. Thus, contrary to the situation in *Ashe*, the jury did not make a determination that Mr. Monroe was not on the scene and could not have been the shooter. Rather, it is more likely that the jury's determination was based on the absence of evidence that Mr. Monroe fled the scene with a weapon, thereby obstructing the murder investigation.

The acquittal on the obstruction of justice charge in this case in no way suggested that jurors necessarily found that Mr. Monroe was not at the murder scene and therefore, could not have committed the murder. For these reasons, we find no abuse of the trial court's discretion in denying Mr. Monroe's motion to quash the bill of indictment.

### *DECREE*

Accordingly, the writ is granted and relief is denied.

**WRIT GRANTED; RELIEF DENIED**

4