UNITED STATES of America, Plaintiff,

v.

Santos MEDINA, a/k/a "Tito," Defendant.

No. 82 Cr. 0713 (HFW).

United States District Court, S.D. New York.

Jan. 31, 1983.

---

Lawrence Kessler, Hofstra Law School, Hempstead, N.Y., for Santos Medina.

John S. Martin, Jr., U.S. Atty., S.D.N.Y. by Louis Freeh, Asst. U.S. Atty., New York City, for U.S.

## MEMORANDUM DECISION

WERKER, District Judge.

Defendant Santos Medina ("Medina") was tried before me on a three-count indictment. Count one charged him with conspiracy to commit a bank robbery and an armed bank robbery. 18 U.S.C. § 371. Count two charged Medina with aiding and abetting a bank robbery, 18 U.S.C. §§ 2 & 2113(a), and count three charged aiding and abetting an armed bank robbery. 18 U.S.C. §§ 2 & 2113(d). On December 16, 1982, the jury acquitted Medina on counts one and three. It was unable, however, to reach a verdict on count two, and I therefore declared a mistrial on that count. The Government seeks to retry Medina on count two. Medina objects and moves for an order dismissing count two on the ground of collateral estoppel. For the reasons that follow, the motion is denied.

## FACTS

On the morning of March 25, 1982, the Manufacturers Hanover Trust Company ("Manufacturers") branch located at 200 East Gunhill Road, Bronx, New York, was robbed by three masked men. Those men were Edwin Torres ("Torres"), Roman Rodriguez ("Rodriguez") and Jorge Pierna ("Pierna"), all of whom were named in the indictment as coconspirators. At the trial, Victor Rosado ("Rosado") testified that, on the morning of the robbery, he and two other men were in a truck on their way to deliver a refrigerator. They drove past the bank and noticed three individuals run out of the bank and get into a green car. The driver of the truck then decided to chase the car. Rosado testified that, during the course of the chase, a maroon car drove in front of the truck and blocked its path. The driver of the car, whom Rosado described as a young spanish male with a beard, told the deliverymen that the bank robbers were armed and dangerous and that the police had been informed. Rosado stated that, in his opinion, the maroon car was attempting to stop the chase.

Rosado further testified that, after the incident with the maroon car, the deliverymen continued their pursuit of the robbers. Rosado could not say where the maroon car went. The deliverymen then spotted a police car and flagged it down. They informed the policemen of the previous events, who, in turn began to chase the green car. The deliverymen followed. They found the car parked and abandoned. The deliverymen remained there for ap-

proximately a half hour. During that time the maroon car reappeared.

William Hauck, a sergeant in the New York City Police Department, was one of the policemen in the car that was flagged down by the deliverymen. He testified that, after he had reached the abandoned green car, he spoke to an elderly woman who was walking nearby. As a result of his conversation with her, he broadcast an alarm stating that the robbers had changed cars and were fleeing south in a beige car.

Police officer Kenneth Kelly ("Kelly") and detective Frank P. McDonald ("McDonald") also were on the scene. Kelly testified that, while he was at the site of the abandoned car, a light hispanic male approximately 5'11" tall with black hair and a good build called him over and stated that he might have information to give to the police. Kelly summoned McDonald, who began to question the individual, and Kelly walked away. At the trial, McDonald identified the man as Medina. He stated that, as he was approaching Medina, he saw him attempt to enter a maroon oldsmobile. McDonald asked Medina to identify himself, but Medina refused because he did not want to get involved. McDonald informed Medina that he could either identify himself then, or do so at the police station. Medina then gave McDonald his driver's license at McDonald's request, and McDonald noted his name, address and date of birth. Medina said he had no other information and was released.

Edwin Baez ("Baez") also testified at the trial.[1] Rodriguez, one of the participants in the robbery, testified under a grant of immunity. Their testimony, inconsistent in several respects, was as follows. Baez recounted that, on the evening of March 23, 1982, he met Torres and Medina. Torres asked him whether he would be willing to drive for approximately $1000. Baez accepted the offer, but stated that, at that time, he was unaware that a bank robbery was being planned. Apart from greeting Baez, Medina said nothing. As Baez was leaving, however, he overheard Medina tell Torres that "it was too much." Baez did not know what Medina meant by that remark.[2] On the morning of March 25, 1982, Baez met Torres, Rodriguez and Pierna. The latter three drove off in Torres' green car, and Baez followed in his own, a brown and beige camaro. They stopped at a site along Mosholu Parkway, and Torres told Baez to wait there until the other three men returned. The men left in the green car, returned about fifteen minutes later and got into Baez' car. Baez saw that Torres had a gun, and he thought Pierna may have had one also. The four men then took off in Baez' car, but were soon captured and arrested by the police in the vicinity of 186th Street and Jerome Avenue. Baez testified that he did not see Medina at all that day.

Rodriguez revealed that, the night before the robbery took place, he had a conversation with Medina in which Medina asked him if he would be interested in participating in a bank robbery. According to Rodriguez, Medina stated that they planned to rob the Manufacturers branch on Gunhill Road. Rodriguez agreed to participate but refused to carry a gun. He stated that, the following morning, Medina picked him up and they then met Torres, Pierna and Baez, who was sitting in his camaro. Rodriguez testified that Medina informed him that the camaro would be used as a "switch car." Rodriguez, Torres and Pierna then discussed the details of carrying out the robbery. The plan was that Rodriguez and Torres would go into the tellers' booths, Rodriguez would hold the bag into which the money would be stashed and Pierna would stand by the door. At this time, Rodriguez did not speak at all to Baez, and although not certain, he did not think that Medina was present during this conversation. He did state, however, that Medina did not go with them to the bank.

1. Baez was not prosecuted in exchange for his testimony.

2. The Government sought to persuade the jury to infer that Medina meant that $1000 was too much money to give Baez for merely driving.

According to Rodriguez, he, Torres and Pierna first went to a bank on Sedgwick Avenue. That bank was closed, however, so they then proceeded to Manufacturers. They robbed the bank in accordance with their previously made plans. Torres and Pierna both carried guns, but Rodriguez stated that he did not. After they had accomplished their task, they escaped by means of the green car and then switched to Baez' beige camaro. As testified to by Baez, they were stopped by the police in the course of their escape. Rodriguez testified that he, Torres and Pierna had agreed to split the stolen money three ways. In addition, Baez was to be given some money for driving, and Rodriguez was to give Medina part of his take.

Medina, who did not take the stand, was arrested on September 16, 1982 by Edward Bodigheimer ("Bodigheimer"), a special agent with the Federal Bureau of Investigation. Bodigheimer testified that, when he interviewed Medina after his arrest, Medina initially denied any involvement in the robbery. When Bodigheimer reminded him that, on the day of the robbery, he had given his license to a police detective, Medina changed his story. Medina stated that he had met Rodriguez on the morning of the robbery, and Rodriguez informed him that he was going to rob a bank. Medina tried to dissuade him. He then left Rodriguez and went to the Thruway Cab Corporation, where his brother worked. He remained there for about half an hour and then went to have the windows of the maroon car tinted. When he realized he did not have enough money for the job, he left and went to Manufacturers to try to prevent Rodriguez from committing the robbery. He saw Rodriguez and two other men enter the bank. When he saw a truck chase the robbers after they had exited the bank, he followed. He approached the truck and told the men inside that the robbers were armed and that police already were aware of the incident. Medina informed Bodigheimer that he then proceeded to the escape car, spoke to a sergeant on the scene and gave him a description of the perpetrators of the robbery. Bodigheimer

showed Medina photographs of Torres, Pierna, Rodriguez and Baez. Medina identified all four men but stated that he had never spoken to Torres.

At the trial, Medina's attorney admitted that Medina knew that the bank robbery was going to happen. He also claimed that Medina knew that the robbers were armed and so informed the deliverymen. It was Medina's position, however, that he went to the scene of the robbery out of curiosity only, not because he was a participant in the crime.

## DISCUSSION

Medina claims that the acquittal on count three collaterally estops the Government from retrying him on count two. His argument runs as follows. The offenses of bank robbery and armed bank robbery differ in only one respect. Armed bank robbery requires, in addition to all of the elements of the crime of bank robbery, proof that a person was assaulted or endangered through the use of a dangerous weapon or device during the course of the robbery. Thus, the only factor that distinguished count two from count three was the dangerous weapon element. Medina thus contends that, since he admitted that a gun was used in the commission of the robbery and since no rational jury could have concluded otherwise, the jury must have acquitted Medina for a reason other than the failure to prove the dangerous weapon element, that is, because some element of count two had not been proven.

The doctrine of collateral estoppel, which is an ingredient of the Fifth Amendment guarantee against double jeopardy, *Ashe v. Swenson*, 397 U.S. 436, 445–46, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970), precludes the Government from litigating an issue of ultimate fact once the issue has been resolved in the defendant's favor by a valid and final judgment. *E.g., Id.* at 443, 90 S.Ct. at 1194; *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979); *United States v. Jacobson,* 547 F.2d 21, 23 (2d Cir. 1976), *cert. denied,* 430 U.S. 946, 97 S.Ct.

1581, 51 L.Ed.2d 793 (1977). The burden is on the defendant to prove that the jury's verdict in the previous trial *necessarily* resolved in his favor the issues sought to be raised in the second prosecution. *E.g., United States v. Seijo,* 537 F.2d 694, 697 (2d Cir.1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977); *United States v. Cala,* 521 F.2d 605, 608 (2d Cir. 1975); *United States v. Gugliaro,* 501 F.2d 68, 70 (2d Cir.1974). Since, in most cases, the basis for the prior verdict cannot be determined with certainty, the defendant's burden is a heavy one. *United States v. Clark,* 613 F.2d 391, 400 (2d Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *United States v. Seijo,* 537 F.2d 694, 697 (2d Cir.1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977); *United States v. Gugliaro,* 501 F.2d 68, 70 (2d Cir.1974). The court, however, "should not strain to dream up hypertechnical and unrealistic grounds on which the previous verdict might conceivably have rested." *United States v. Jacobson,* 547 F.2d 21, 23 (2d Cir.1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977); *see Ashe v. Swenson,* 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979).

■ After examining the pleadings, the evidence, the charge and the summations, *Ashe v. Swenson,* 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970), I find that the acquittal on count three did not necessarily resolve in Medina's favor any of the elements of count two. While the proof at the trial overwhelmingly demonstrated that a gun was used during the course of the robbery, there was no direct evidence that Medina aided, induced or procured that activity. In addition, although the jury most likely concluded that Medina knew that the robbers were armed, I instructed the jury that knowledge alone was not a sufficient ground upon which to find Medina guilty as an aider and abettor. I therefore conclude that Medina has failed to sustain his burden of proving that, in acquitting Medina on count three, the jury necessarily determined that an element of count two had not been proven. The Government thus is not collaterally estopped from retrying Medina on count two.

■ Medina also contends that, if a retrial is had on count two, the Government should be precluded from attempting to prove that Medina played a part in recruiting the participants in the robbery and in selecting the target and that Medina was present at the scene of the robbery to act as a lookout. Medina claims that, in view of the testimony at the trial and Medina's own admissions, the jury must have resolved these issues in his favor when it acquitted him on count one, the conspiracy count. I find, however, without relying upon "hypertechnical and unrealistic grounds", *United States v. Jacobson,* 547 F.2d 21, 23 (2d Cir. 1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977), that the jury rationally could have acquitted Medina on the conspiracy charge without deciding whether Medina was guilty of these acts of participation. Preliminarily, I note that, if the jury had determined that the Government had failed to prove that Medina was guilty of these acts, it would have had to acquit Medina on count two. Its failure to reach a verdict on that count therefore must be attributable to its inability to resolve some of these issues. With respect to the testimony at the trial, the credibility of Rodriguez strenuously was attacked, and the jury may have rejected his testimony on that basis alone. The jury very well may have considered Baez' testimony that Medina was with Torres when Torres asked Baez to drive for some money as insufficient proof of Medina's membership in a conspiracy. As for the Government's contention that Medina's role in the robbery was to act as a lookout, the jury may have accepted that contention but found, quite properly, that it was not sufficiently indicative of Medina's entering into an agreement with one or more of the alleged coconspirators to commit the robbery. The Government therefore is not collaterally estopped from attempting to prove at the retrial on count two that Medina participated in the robbery by recruiting the perpetrators, selecting the site and acting as a lookout.

984

## CONCLUSION

For the reasons discussed above, Medina's motion for an order dismissing count two of the indictment on the ground of collateral estoppel is denied.

SO ORDERED.