

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-11-00509-CR

ALAN ALEXANDER ADAME, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 59,236-D, Honorable Don R. Emerson, Presiding

July 18, 2013

## OPINION ON REHEARING

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

We withdraw our opinion and judgment dated June 7, 2013, and substitute the following in its place. We overrule appellant Adam Alexander Adame's motion for rehearing and deny his motion for en banc reconsideration of our opinion of June 7, 2013.

Appellant was charged by separate indictments with intentionally or knowingly causing serious bodily injury to M.M., the three-year-old son of his girlfriend Dianne Fuentes Aguilar, by act (cause number 61,387-D) and omission (cause number 59,236-

D).[1]  The allegations of the two indictments were tried in a single trial by one jury.  The jury found appellant not guilty in cause number 61,387-D and a judgment of acquittal was rendered.  However, the jury found appellant guilty in cause number 59,236-D and assessed a punishment of confinement in prison for twenty-three years.  Appellant presents two issues on appeal asserting, first, that his double jeopardy rights were violated as he was prosecuted a second time for the same offense after an acquittal and, second, that the evidence was insufficient to prove he failed to seek medical care for M.M.  We will affirm.

## Background

In early 2009, M.M., his seven siblings, Aguilar (who was pregnant with appellant's child), and appellant occupied a house in Amarillo.  The home was described as "dirty . . . rodent infested and cold."

On February 3, 2009, police responded to a call that a child was not breathing at the residence.  The responding officer found M.M. lying on a living room rug with vomit on his nose and in his mouth.  Detecting no pulse, the officer began chest compressions until the fire department arrived.  A responding fireman noticed bruising on the face and body of M.M.  In the fireman's opinion, the child was underweight and malnourished.  An ambulance transported M.M. to an Amarillo hospital.  Along the way, CPR continued.

---

[1] *See* Tex. Penal Code Ann. § 22.04(a)(1) (West Supp. 2012 ) (Injury to a child). The offense is a felony of the first degree when committed intentionally or knowingly. Tex. Penal Code Ann. § 22.04(e) (West Supp. 2012).

M.M. was pronounced dead shortly after arrival at the hospital.  According to a registered nurse on duty at the emergency room when M.M. arrived, the child presented with "probably the worst condition of a patient" she had seen.  She described him as "very malnourished" with a distended abdomen.  She noted abrasions and contusions about his body.

According to Aguilar, appellant harmed M.M., first doing so on Thanksgiving Day 2008.  By Christmas, Aguilar believed M.M. "was looking bad" and she hid him from family.

Appellant was not the biological father of the children and was not married to Aguilar.  He acknowledged in a police interview living in the home and helping care for the children.  Concerning the children, he explained "we" had kids.  He felt the children admired him.  M.M. once referred to appellant as "daddy."

Aguilar's oldest child E.P., age eleven at the time of M.M.'s death, said appellant told the children to call him "dad" on the threat of being struck for failing to do so.  In her opinion, appellant was initially nice but grew mean.  He began acting "like the man of the house."  E.P. considered appellant in charge of the home.  At times E.P. observed appellant strike M.M. with his hands or a belt or kick him.  She recalled an occasion when appellant struck M.M. on the head with the metal part of a belt.

According to nine-year-old A.A., another sibling, M.M. was frequently left in a closet for lengthy periods.  A.A. gave M.M. food when appellant put M.M. in a closet.  In A.A's opinion, M.M. needed food because his "bones were all skinny and bruised up. . . . "  There was evidence that Aguilar told police after the death of M.M. that A.A.

3

and not appellant injured M.M. But at trial, Aguilar also conceded lying about facts in her former statements.

At times, Aguilar and appellant compelled M.M. to remain in a cold bath. E.P. saw him shaking. When asked how long M.M. remained in the bath she replied, "Probably for all day." Once, according to E.P., M.M. passed out in the bathtub and was not breathing. Aguilar revived him by placing him "in the heater" and "breath[ing] in his mouth." This was the last time M.M. was placed in a cold bath.

E.P. recalled once observing appellant and Aguilar force M.M. to eat excrement. Appellant withheld food from M.M., apparently as discipline for episodes of enuresis. On cross-examination, E.P. agreed that M.M. was denied food completely and he was not allowed to eat or drink. But the duration of the denial was not developed.

According to eight-year-old I.M., also a sibling, when appellant was angry with M.M., he threw M.M. outside. A counselor working with A.A. recounted that A.A. once told him that appellant wrapped M.M. in a blanket and kicked him, stepped on him, sat on him so that he could not breathe and then threw him outside.

A plumber, familiar with M.M. from an earlier call, believed by January 2009 the child looked "pretty sick." He no longer smiled but appeared "kind of droopy," his eyes appeared "sad" with dark circles, and he "looked a little bit skinnier."

Appellant forced M.M. to sleep in a small space between the bed appellant and Aguilar occupied and the wall so M.M. "wouldn't get up at night and try to get something to eat . . . or use the restroom on himself." Agreeing with a question on cross-

4

examination, Aguilar indicated M.M. was "semi-comatose" for "about a month" before his death. She qualified the response by stating M.M. crawled about the house.

The night before M.M. died Aguilar fed him leftovers outside of appellant's presence. This, she explained, was because there was conflict when she fed M.M. in appellant's presence. On the morning of M.M.'s death, Aguilar noticed he was having difficulty breathing. Appellant called 911.

After M.M. was taken by ambulance to the hospital, appellant said, according to Aguilar, "that he was sorry and that he was a baby killer." Appellant acknowledged a jury viewing photographs of M.M. would believe the child suffered "neglect and abuse." After M.M.'s death, Aguilar's remaining children were placed in the custody of Child Protective Services. Aguilar plead guilty to a charge of injury to a child by omission and was called by the State as a witness at appellant's trial.

An autopsy was ordered. The pathologist conducting the procedure opined the cause of M.M.'s death was blunt force injuries of the head superimposed on dehydration and malnourishment. In this regard he explained the injury might not have been lethal absent malnourishment and dehydration.

As for blunt force trauma, he noted several contusions and abrasions about the face of M.M. He also observed contusions and abrasions to the limbs, back, buttocks, and right hip. The bruises noted on the body, in the pathologist's opinion, occurred at different times. Also observed was an angulated skull fracture and swelling of the brain.

As for dehydration and malnutrition, the pathologist's report identified "[m]arked decrease in adipose tissue including omentum and subcutaneous fat . . . . [and]

5

[m]arked decrease in muscle mass." Illustrative of dehydration, the pathologist pointed to decreased fluid in soft tissues causing wrinkling of the skin. He explained the omentum is "like an apron of fat which normally extends from the bowel and—covers the organs, was—instead of being nice and thick with fat, which is reserved nutrition and energy, it was almost devoid of fat. It was mostly clear; you could see through it, and it was mostly just fibrous tissue and connective tissue."

After assuming the definition of serious bodily injury is an "injury that creates a substantial risk of death or causes death, serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ," the pathologist opined the skull fracture and level of malnourishment constituted serious bodily injuries.

Appellant was tried on amended indictments. The instrument in Cause No. 59,236-D alleged:

> [O]n or about the 3rd day of February, 2009 . . . [appellant] did then and there intentionally or knowingly, by omission, cause serious bodily injury to [M.M.], a child 14 years of age or younger, by failing to provide food or seek medical care for the child, or a combination thereof, and [appellant] had a legal duty to act, namely, [appellant] had assumed care, custody, and control of the child.

Its counterpart in Cause No. 61,387-D charged:

> [O]n or about the 3rd day of February, 2009, [appellant], did then and there knowingly or intentionally cause serious bodily injury to [M.M.], a child under the age of 14 years, by striking the said [M.M.] with his hand or a belt, or by kicking the said [M.M.] with his foot, or by throwing the said [M.M.] against a wall, or by making the said [M.M.] sit in cold water for long periods of time, or a combination thereof.

The jury charges contained instructions on the law of parties.

6

Analysis

By his first issue appellant contends, "The trial court erred in permitting the State to try Appellant twice, for the same criminal act, by failing to make the State elect whether Appellant was guilty of an act or an omission." The nub of appellant's argument is he was subjected to a second prosecution for the same offense following acquittal, thus violating his double jeopardy rights.

The Double Jeopardy Clause of the Fifth Amendment to the Constitution consists of three separate protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.E.2d 656 (1969). Here appellant's concern is with the first protection, a successive prosecution following acquittal.

> The Double Jeopardy Clause is cast expressly in terms of being twice put in jeopardy, and the Supreme Court of the United States has consistently interpreted that clause to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. The Supreme Court has said that where successive prosecutions are at stake the guarantee of not being twice placed in jeopardy serves a constitutional policy of finality for the defendant's benefit. This policy protects the accused from attempts to relitigate the facts underlying a prior acquittal and from attempts to secure additional punishment after a prior conviction and sentence. Because applicant was subjected to only one trial, his right to be free from multiple trials for the same offense . . . [is] not implicated.

*Ex parte Herron,* 790 S.W.2d 623, 624 (Tex.Crim.App. 1990) (op. on reh'g) (internal quotation marks and citations to *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543, 553 (1971) (plurality opinion); and *Ashe v. Swenson,* 397 U.S. 436, 90

S.Ct. 1189, 25 L.Ed.2d 469 (1970) omitted); *Martinez v. State,* No. 04-05-00743-CR, 2006 Tex. App. Lexis 11271, at *5 (Tex.App.--San Antonio Sept. 13, 2006, no pet) (mem. op., not designated for publication) ("When a defendant is subjected to a single trial, only the last aspect of the protection against multiple punishments is involved"). Appellant was not twice punished for the same offense and, as in *Herron,* was not subjected to multiple prosecutions for the same offense since he was tried in a single trial before the same jury. Appellant has not shown a double jeopardy violation. His first issue is overruled.

Through his second issue, appellant argues the evidence was insufficient to support a conviction for injury to a child by omission for failure to seek medical care for M.M.

A sufficiency review requires the appellate court to determine whether, considering all of the evidence in the light most favorable to the verdict, a fact finder is rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App. 2010). In conducting this review, we must defer to the trier of fact's role as the sole judge of the credibility and weight that testimony is to be afforded. *Id.* The trier of fact may draw multiple reasonable inferences from the evidence presented as long as each inference is supported by the evidence. *Hooper v. State,* 214 S.W.3d 9, 15 (Tex.Crim.App. 2007).

As alleged here, a person commits the offense of injury to a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally,

8

knowingly, or recklessly by omission, causes to a child serious bodily injury. Tex. Penal Code Ann. § 22.04(a) (West Supp. 2012). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(a)(46) (West Supp. 2012). An omission that causes serious bodily injury is actionable under § 22.04(a) if "the actor has a legal or statutory duty to act . . . or "the actor has assumed care, custody, or control of a child." Tex. Penal Code Ann. § 22.04(b) (West Supp. 2012). "[T]he actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child." Tex. Penal Code Ann. § 22.04(d) (West Supp. 2012). A "child" under § 22.04 "means a person 14 years of age or younger." Tex. Penal Code Ann. § 22.04(c) (West Supp. 2012).

Reiterated, appellant argues the evidence was insufficient to support his conviction based on a failure to seek medical care. But under the indictment, and the jury charge, appellant could be found guilty of injury to a child by omission on sufficient proof that he intentionally or knowingly caused M.M. serious bodily injury by failing to provide the child with food when appellant had assumed care, custody and control of the child. The evidence authorized a reasonable trier of fact to find beyond a reasonable doubt that appellant injured M.M. by failing to provide the child with food. It is thus unnecessary for us to consider whether the evidence showed a failure to seek medical care. Appellant's second issue is overruled.

Conclusion

Having overruled appellant's two issues on appeal, we affirm the judgment of the trial court.


James T. Campbell
Justice


Publish.