In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 17-1831

SPENCER RILEY,

*Petitioner-Appellant,*

*v.*

VICTOR CALLOWAY,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cv-02162 — **Andrea R. Wood**, *Judge.*

———————————

ARGUED NOVEMBER 15, 2017 — DECIDED FEBRUARY 20, 2018

———————————

Before WOOD, *Chief Judge*, MANION, and KANNE, *Circuit Judges*.

MANION, *Circuit Judge.* Spencer Riley was acquitted of first-degree murder by an Illinois jury, but he later was convicted at a bench trial of being an "armed habitual criminal." The state had charged these crimes together but, with defense counsel's acquiescence, obtained a severance to proceed separately with the armed habitual criminal count. The state appellate court affirmed Riley's conviction on that count, and

the Supreme Court of Illinois declined further review. Riley then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 claiming that, in light of his acquittal of murder, the state was collaterally estopped from prosecuting him as an armed habitual criminal because of *Ashe v. Swenson*, 397 U.S. 436 (1970). Riley had pursued, but lost, that same argument on direct appeal, and the district court denied relief on the ground that the appellate court did not unreasonably apply clearly established federal law in rejecting his *Ashe* claim. We agree with the district court's assessment and affirm its judgment.

## I. Background

The facts of the crimes are recounted in *People v. Riley*, 2012 IL App (1st) 101607-U. On October 30, 2007, Cedric Hudson was shot and killed while he was drinking with friends. Six bullets struck Hudson that night; three of those caused extensive damage. The investigation eventually focused on Riley, and the state charged him with six counts of first-degree murder, 720 ILCS 5/9-1(a)(1)–(2), and one count of being an armed habitual criminal, 720 ILCS 5/24-1.7(a). The judge severed the armed habitual criminal count at the state's request—but with defense counsel's agreement—and proceeded with the murder trial. The state's case centered on four witnesses: Demetrice Allen, Frederick Brown, Kenneth Head, and Detective Dan Gorman.

Demetrice Allen testified that on October 30, 2007, he was in a vacant lot with his friends, Brown and Hudson. Allen said Riley also was present, but he could not remember if Sheeba Mackmore was with the group. Allen testified that he did not see Riley leave the vacant lot and go to his house across the street, he did not see Riley carrying a handgun, he

did not see Mackmore and Hudson arguing, and he did not witness the shooting of Hudson. Allen insisted he could not recall the substance of his pretrial conversation with an assistant State's Attorney and lead detective Dan Gorman. But the prosecutor introduced Gorman's recollection of Allen's statements from that pretrial meeting, contradicting his trial testimony. What Allen had said previously is that Riley arrived by car, left the group and walked to his house, and moments later returned wearing a white hoodie with his hands in the front pocket. Allen also had said during his meeting with Detective Gorman and the assistant State's Attorney that Riley told Hudson not to speak to the "boss"—Mackmore—"like that," pulled a pistol from his hoodie, and shot Hudson. The state also introduced Allen's grand jury testimony, which tracks what he told Gorman and the assistant State's Attorney. However, the color of the hoodie was not mentioned in the grand jury testimony.

Frederick Brown testified at the murder trial that he saw Hudson and Mackmore conversing and at the same time saw Riley arrive on foot from his house across the street. Riley wore a hoodie—Brown described it as black, not white—and walked with his hands in the hoodie's pockets. Once he arrived he walked up to Hudson and told him, "Don't talk to my boss like that," pulled a gun from the hoodie, and shot Hudson once. Brown said he fled immediately but heard six more shots as he ran.

Kenneth Head likewise testified that Riley had shot Hudson. Head said that Riley and Hudson had arrived in separate cars around the same time. Hudson walked toward Riley while holding up his hands. Riley then pulled a gun from the back of his pants and shot Hudson once. Head heard five

more shots as he escaped from the lot. The police had interviewed Head in January and March 2008. In January he had denied seeing the shooting, which, at trial, he said was a lie prompted by fear. Then in March, Head had said that Riley approached the group on foot wearing a hoodie and shot Hudson after pulling a gun from the hoodie's front pocket while Hudson was speaking with Mackmore. The prosecutor impeached Head with his March statement, while defense counsel got him to concede that he had been fighting that night with Hudson, the victim.

The coroner testified that Hudson had been shot multiple times in his life, including six times that night. He was able to recover three intact bullets, two bullet fragments (one with two pieces of a lead core and an aluminum jacket; the other with a copper jacket), and three of four bullets lodged in Hudson's body from a previous shooting. Riley stipulated to the admission of a ballistics report that is very confusing but fairly can be read as allowing for the possibility that more than one gun was used on October 30. In fact, on cross-examination Detective Gorman conceded the "possibility" that more than one gun was involved.

Detective Gorman testified that while he was transporting Riley from the police station to a court hearing on March 11, 2008, Riley asked who would be testifying against him. When Gorman replied that he could not talk about the case, Riley speculated that Mackmore had identified him as the shooter and said "he wasn't worried about the case against him and that dead men can't come to court and testify." Riley also bragged to Gorman that the prosecution's witnesses would become his witnesses at trial and would say the police forced them to identify him as the shooter. Gorman conceded that no

gun had been recovered from Riley, that he never went to Riley's house to look for one, and that Riley had never admitted committing the murder.

In closing argument defense counsel asserted that "two separate calibers of ammunition" were found, thus suggesting the use of "more than one gun." According to the state appellate court, one defense theory argued by Riley's lawyer—Riley had not testified—is that someone other than Riley discharged the bullets that killed Hudson. In finding Riley not guilty of first-degree murder, the jury answered a special interrogatory finding that the prosecution had not proven "that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person."

Allen, Brown, and Detective Gorman again testified at the armed habitual criminal trial before the same judge, and their testimony was nearly identical to what each said at the murder trial. But this time, instead of saying he did not recall what happened, Allen said that he did not see whether Riley had shot Hudson. The state again introduced what had been Allen's contradictory grand jury testimony and the statements he made when interviewed by Gorman and the assistant State's Attorney. And this time Brown said that, before running away, he had seen Riley shoot Hudson two or three times, not just once.

At this bench trial the parties stipulated that Riley had two, qualifying prior convictions, leaving the judge to decide only whether Riley possessed a gun, 720 ILCS 5/24-1.7(a). During closing argument the prosecutor contended that Brown had testified credibly and that Allen's interview state-

ments and grand jury testimony corroborated Brown's testimony. Defense counsel pointed out the inconsistencies in the stories of the state's witnesses and noted that none of them could describe the gun allegedly possessed by Riley, despite identifying him as the shooter.

The judge found Riley guilty. The inability to recover the gun was insignificant, the judge reasoned, because in many cases a gun is not recovered. The judge noted that two witnesses had placed Riley at the crime scene (located across the street from his home) and testified he shot Hudson. And, the judge added, Riley's statements to Detective Gorman before his murder trial were incriminating. The judge sentenced Riley to 15 years' imprisonment.

On direct appeal, Riley raised the issue of collateral estoppel for the first time, relying on *Ashe v. Swenson*. In affirming Riley's conviction, the Illinois appellate court reviewed that claim for plain error. The court ruled that the state was not collaterally estopped from prosecuting Riley as an armed habitual criminal because whether he had possessed a gun was not decided by the jury at his murder trial. At issue in the murder trial was whether Riley had *killed* Hudson using a gun, not simply whether he possessed a gun. During closing argument in the murder case, one theory the defense had presented was that more than one person had a gun and could have shot Hudson, creating doubt whether Riley had fired the fatal shots even if he was one of the shooters. Another defense theory was that the state's eyewitnesses—all convicted felons—should not be believed at all. The court surmised that "a rational jury could have based its acquittal of defendant's murder charges on an issue and a conclusion apart from whether defendant possessed a gun." "To determine whether

defendant possessed a weapon to sustain a conviction for being an armed habitual criminal, the trier of fact would not need to determine whether defendant discharged a weapon or if he killed Hudson," the court concluded.

Riley then filed his § 2254 petition. In denying relief, the district court reasoned that only two facts from the murder trial were preclusive: Hudson was murdered, and Riley did not kill him. The court explained that the jury could have acquitted Riley for any number of reasons. And simply because the jury acquitted him does not mean that Riley did not possess a gun. Still, in granting a certificate of appealability, the court said it appreciated "that the evidence at Riley's armed habitual criminal trial was virtually the same as the evidence presented at his earlier murder trial" and that the "arguably conflicting results" implicate "language in *Ashe* prohibiting a prosecutor from using a first trial as a dry run for a second trial."

## II. Discussion

On appeal Riley presses his claim that the doctrine of collateral estoppel should have prevented the state from proceeding to trial on the severed count charging him as an armed habitual criminal once the jury acquitted him of murder. To succeed under § 2254, Riley must establish that the appellate court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Lee v. Avila*, 871 F.3d 565, 570 (7th Cir. 2017). And an application of clearly established federal law is "unreasonable" for purposes of § 2254(d) only if it is "objectively unreasonable,

not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quotation marks omitted); *see Hicks v. Hepp*, 871 F.3d 513, 524 (7th Cir. 2017). Riley does not overcome this steep hurdle.

Riley's claim is governed by *Ashe v. Swenson*, 397 U.S. 436 (1970). Collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443; *see also Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358–59 (2016) (discussing *Ashe*).

In this court Riley repeats contentions he made to the state appellate court and the district court. He principally insists that at his murder trial the jury "conclusively resolved the issue of the murderer's identity" in his favor and yet "the State relitigated that precise issue at a subsequent bench trial." Riley points out that at closing argument in the murder trial the prosecutor asserted that only one gun was used to kill Hudson. And, Riley continues, the jury announced via special interrogatory its determination that Riley did not discharge a firearm that proximately caused death. Riley asserts that the prosecutor's closing argument and the special interrogatory, taken together, establish that he did not possess the gun used by the murderer during the shooting. This same question was relitigated at his bench trial, says Riley, since the state presented "'virtually the same' identification evidence" that his "murder jury had rejected in acquitting him of murder and personal discharge."

In pressing this theory, though, Riley tries to distance himself from his own position at the murder trial, that someone else possessed a second gun that might have been the source

of the bullets which killed Hudson. According to Riley, the district court ignored evidence from the murder trial establishing that only one gun was fired at Hudson and wrongly insinuated without an evidentiary foundation that more than one gun was used to shoot the bullets that struck Hudson. Riley concedes that, yes, his trial lawyer did assert in closing argument that multiple guns were present in the vacant lot, but he says the district court should not have inferred from counsel's closing that he was asking the jury to infer that more than one gun was used in the shooting.

Riley's point contradicts what occurred; whether or not his lawyer intended to suggest that Riley shot at Hudson, he was asking the jury to infer that *someone else* had a *second* gun that was used to kill Hudson—meaning that, even if Riley did possess a gun as the eyewitnesses said, his gun did not fire the bullets that killed Hudson.

Putting aside § 2254(d) for the moment, we agree with the district court that the factual issues decided at the murder trial are not identical to any pertinent fact at the armed habitual criminal trial. What the jury *necessarily* decided is that "the allegation was not proven that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person." That's all. The jury's verdict and answer to the special interrogatory do not establish that the jury necessarily found that Riley did not possess a gun at all that night (or even that he did not fire a gun). The verdict establishes only that Riley didn't fire the bullets that *killed* Hudson. No other finding from the murder case is preclusive.

Riley muddles things with redundant arguments in his brief, but the case is straightforward. Given the high standard

of proof needed to convict someone of murder—beyond a reasonable doubt—it is not surprising that the jury acquitted Riley of murder with the poor evidence presented. There was no physical evidence tying Riley to the crime. And the eye-witnesses were less than ideal given their inconsistent, sometimes shifting stories and their shared status as convicted felons. In contrast, all that was required to convict Riley of being an armed habitual criminal was proof that he possessed a gun, along with the two prior convictions (convictions that were stipulated to)—a much easier case for the state to win. *See* 720 ILCS 5/24-1.7(a).

All that said, however, the question for purposes of § 2254(d) is not whether the state appellate court got the correct answer, but whether it unreasonably applied federal law. *Lee*, 871 F.3d at 570. Section 2254(d) imposes a hurdle that is intentionally hard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This statutory provision "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," but it leaves open the authority of a federal court to issue a writ of habeas corpus only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with Supreme Court precedent. *Id.*

In rejecting the *Ashe* claim brought by Riley, the state appellate court cited only state cases, but that does not matter. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (explaining that § 2254(d) will bar federal relief even if state court does not cite, or even know about, controlling Supreme Court precedents "so long as neither the reasoning nor the result of the state-court decision contradicts them"). The appellate court concluded that, at the first trial, "the relevant issue was

whether defendant killed Hudson by use of a weapon and not whether he merely possessed a weapon, which was the relevant issue during the AHC trial." The court noted that Riley had presented a theory suggesting the use of multiple guns and painted the state's witnesses as unreliable, meaning "a rational jury could have based its acquittal of defendant's murder charges on an issue and a conclusion apart from whether defendant possessed a gun." This assessment is not an unreasonable application of *Ashe*, thus we affirm the district court's judgment.