IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 18-0906
_____

FILED
**April 24, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

TYLER BRETT KENNEDY,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Jefferson County
The Honorable Bridget Cohee, Judge
Case No. 17-F-25

AFFIRMED

_____

Submitted: January 29, 2020
Filed: April 24, 2020

J. Daniel Kirkland, Esq.                     Patrick Morrisey, Esq.
Arnold & Bailey, PLLC                        Attorney General
Charles Town, West Virginia                  Elizabeth Grant, Esq.
                                             Assistant Attorney General
Counsel for Petitioner                       Holly M. Flanigan, Esq.
                                             Assistant Attorney General
                                             Charleston, West Virginia
                                             Counsel for Respondent

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "'In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.' Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997)." Syl. Pt. 2, *State v. Hinchman*, 214 W. Va. 624, 591 S.E.2d 182 (2003).

2. When a sentencing court makes a written finding of sexual motivation under West Virginia Code § 15-12-2(c) (2018), the sentencing court has the discretion to determine that the particular misconduct that led to the defendant's conviction exhibited sexual motivation, and we will not disturb this determination on appeal unless the sentencing court abused its discretion.

3. "The principle of collateral estoppel applies in a criminal case where an issue of ultimate fact has once been determined by a valid and final judgment. In such case, that issue may not again be litigated between the State and the defendant. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)." Syl. Pt. 1, *State v. Porter*, 182 W. Va. 776, 392 S.E.2d 216 (1990).

**Armstead, Chief Justice:**

Petitioner, Tyler Brett Kennedy, was indicted for sexual assault in the second degree and conspiracy to commit sexual assault in the second degree. According to the indictment, Petitioner sexually assaulted his victim while she was physically helpless. A jury convicted Petitioner of simple battery as a lesser included offense, and the Circuit Court of Jefferson County determined that Petitioner's battery was sexually motivated. This finding means that Petitioner must register as a sex offender. W. Va. Code § 15-12-2(c) (2018).[1]

Petitioner appeals from the circuit court's sentencing order, arguing that the circuit court abused its discretion and erred when it found that Petitioner's offense was sexually motivated. Based on the record before us, the arguments of the parties, and the applicable law, we find no abuse of discretion and no error; therefore, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On April 23, 2016, Petitioner's victim—sixteen-year-old A.M.[2]—was drinking alcohol with other young people at the home of an acquaintance. A.M. became inebriated and, in time, fell and hit her head. She was taken by car to Jefferson Medical

---

[1] W. Va. Code § 15-12-2(c) provides that "[a]ny person who has been convicted of a criminal offense where the sentencing judge made a written finding that the offense was sexually motivated shall also register as set forth in this article [i.e., the Sex Offender Registration Act]."

[2] Due to the sensitive facts of this case, we protect the identities of the victim and other fact witnesses by using their initials rather than full names. *See* W. Va. R. App. P. 40(e) (2010). *See e.g.*, *In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R.*, 230 W. Va. 731, 742 S.E.2d 419 (2013).

1

Center, where a blood test revealed that her alcohol serum content was .32. A urine screen showed that she had opiates and marijuana in her system. A.M.'s condition was serious, and she was transferred to Berkeley Medical Center by ambulance.

The morning after, A.M. communicated with her friend, B.S., about what had happened. B.S. told A.M., "you let people have sex with you" and texted that A.M. "had sex with" Petitioner. A.M. reported these allegations to her nurse. This led to a forensic examination by a nurse and a police investigation. Police interviewed Petitioner, who gave a recorded statement denying that he sexually assaulted A.M.

In January 2017, a Jefferson County grand jury indicted Petitioner for sexual assault in the second degree and conspiracy. The sexual assault count charged Petitioner with "unlawfully and feloniously engag[ing] in sexual intercourse with A.M. without the consent of A.M. and when A.M. was physically helpless" in violation of W. Va. Code § 61-8B-4(a)(2) (1991).[3] The conspiracy count accused Petitioner of "conspir[ing] with [Z.P.] and two Juveniles (J.M. and J.K.) for the purpose of committing the felony offense of second degree sexual assault" in violation of W. Va. Code § 61-10-31 (1971).[4]

---

[3] W. Va. Code § 61-8B-4(a) provides that "[a] person is guilty of sexual assault in the second degree when: . . . (2) [s]uch person engages in sexual intercourse or sexual intrusion with another person who is physically helpless."

[4] W. Va. Code § 61-10-31 provides that it is "unlawful for two or more persons to conspire . . . to commit any offense against the State . . . if . . . one or more of such persons does any act to effect the object of the conspiracy."

Petitioner's trial began on April 24, 2018, and lasted four days. The State's witnesses included A.M. and five other young people who were present at S.R.'s house during the alleged sexual assault. The State also offered Petitioner's recorded statement.

## A.M.'s Testimony

A.M. testified that, on April 23, 2016, she went to the home of an acquaintance, S.R. A.M. went there with her friend, B.S., and their plan was to acquire some alcohol, stay for a while, and then depart for A.M.'s home with the remaining alcohol. A.M. testified that she invited J.K. to join them because she thought he was "cute" and a "potential" sex partner.

A.M.'s friend, B.S., brought money, and Petitioner used this money to buy vodka for them. A.M. recalled drinking what amounted to three-to-four shots of vodka "incredibly fast"—faster than the other young people. She also crushed and snorted a line of hydrocodone.

According to A.M., J.K. sat beside her on the couch, and she flirted with him. The next thing she remembered was waking up in the ambulance. She denied consenting to having sex with J.K., with Petitioner, or with two other young men, J.M. and Z.P., who were present in the home.

## B.S.'s Testimony

A.M.'s friend, B.S., testified next. According to B.S., A.M. went to S.R.'s home intending to have sex with J.K., and A.M. cajoled B.S. into giving Petitioner money to buy alcohol. B.S. recalled that A.M. drank "two if not more" cups of vodka and snorted

Oxycodone. At some point, A.M. went to the back room with J.K. According to B.S., A.M. was "a bit tipsey[,] but she could still walk . . . and talk pretty normally."

A.M. and J.K. returned from the back room, and J.K. left the party sometime later. A.M. resumed drinking and grew increasingly intoxicated. A.M. began telling Petitioner to "eff" her, and she began touching Petitioner. Petitioner grabbed her, touching her buttocks and breasts and pulling her pants down. B.S. and others protested because "the way he was grabbing her didn't look okay."

Then the guys yelled, "[S]omeone . . . finish her already[,]" and S.R. said, "[J]ust have sex with her already[.]" According to B.S., Petitioner said, "[O]kay, I will," and he and another young man, Z.P., carried A.M. to the back room. B.S. reported that Petitioner and Z.P. "had to carry her. . . . She was so intoxicated that she couldn't walk herself back there."

B.S. assumed that Petitioner had sex with A.M., but she could not say so for sure. Two other young men, J.M. and Z.P., went to the back room "to watch[.]" Petitioner emerged from the room sometime later, as did Z.P. J.M. remained, however, and B.S. saw him "dry humping" A.M. when she entered the room. B.S. told J.M. to "get off her" and helped others "put her clothes back on." B.S. reported that A.M. "was incoherent" and "didn't understand" when she was spoken to or "know . . . what was going on."

B.S. and other young people helped A.M. to the living room, where A.M. "fell off the couch and . . . busted her eyebrow open[.]" A.G. called her mother, and A.M. was taken to the hospital.

4

On cross-examination, B.S. agreed that A.M. yelled "f— me, f— me, f— me" to J.K. and later yelled "f— me, f— me" to Petitioner. B.S. also conceded that Petitioner groped A.M. in "direct response to what she was communicating to him" and that Petitioner "push[ed] her back on the couch and . . . t[old] her to stop" "a couple times[.]" B.S. further admitted that, though she believed it was "inappropriate" for Petitioner and Z.P. to carry A.M. to the back room, she did not stop them because A.M. "was communicating a willingness to do something[.]"

On redirect, B.S. testified that her opinion had changed since that night and that she did not believe A.M. was capable of consenting to sex. Yet, on further cross-examination, B.S. agreed that B.S. was "probably the soberest person" there and that, when "all this happened [she] didn't think anything was wrong because [she] thought [A.M.] was communicating a willingness to act[.]"

### A.G.'s Testimony

A.G. remembered being at S.R.'s home on April 23, 2016. A.G. denied any knowledge of whether A.M. had sex with anyone. According to A.G., A.M. "was mainly just laying on the couch and . . . being really loud with . . . moaning and groaning noises." This included "saying . . . eff me or whatever . . . frequently but not . . . too much." A.G. assumed that when Petitioner and Z.P. carried A.M. to the backroom they were placing her "in bed or something" so she could rest and "calm down[.]" Later, however, she recalled Petitioner asking "one specific time" "should I just go ahead and have sex with [A.M.] since she is screaming eff me anyway[?]" On cross-examination, A.G. agreed that A.M.

5

was "out of control yelling things like, f— me, f— me, f— me" before Petitioner and Z.P. carried her to the back room.

## S.R.'s Testimony

S.R. hosted the April 23, 2016 gathering. S.R. testified that A.M. had sex with J.K., but she did not remember A.M. having sex with Petitioner. She told the police that Petitioner had sex with A.M. because she heard "moaning" coming from the back room, not because she witnessed the two having sex. At first, S.R. denied seeing Petitioner (or anyone else) carry A.M. to the back room. According to S.R., A.M. went to the back room with J.K. and was still there when Petitioner "went back to check on her[.]" Later, however, S.R. conceded that she had given previous sworn testimony that she saw Petitioner carry A.M. to the back room.

## J.M.'s Testimony

J.M. remembered going to S.R.'s house in April 2016. He denied that either he or Petitioner had sex with A.M. There were few other things he professed to remember, and he invoked his right not to incriminate himself.

## Z.P.'s Testimony

Z.P. testified pursuant to a plea agreement. According to Z.P., Petitioner bought vodka with money he received from A.M. A.M. "got really drunk" and then snorted some pills. She became drowsy and "wasn't able to walk." "[S]he was still talking, but . . . it wasn't as . . . clear." In time, "she couldn't respond very well."

Z.P. said that A.M. and J.K. started flirting on the couch after A.M. snorted the pills. At some point someone[5] said, "[I]f you're going to have sex with her, just do it." J.K. responded by carrying A.M. to the back room. J.K. emerged from the back room sometime later, and A.M. returned from the back room "on her own" minutes after that. J.K. left for home about 30 minutes later.

Z.P. testified that A.M.'s intoxication had "intensified" still further by the time J.K. left. "[S]he was . . . almost incoherent . . . [and] couldn't walk." At this point, Petitioner began "flirting with her, grabbing her butt and her boobs." "[I]t sounded like she was trying to say, f— me, but I am not for sure[.]"[6] She also "tr[ied] to bite at him[.]" Several people—including Z.P.—warned Petitioner to leave her alone. Instead, Petitioner carried A.M. to the back room with help from Z.P. According to Z.P., "nothing was said like, hey, help me take her back . . . [and] nothing like, you can have sex with her, nothing like that[. H]e was just . . . , help me." Yet Z.P. did recall someone saying, "[J]ust go ahead finish her already[.]" Z.P. seemed to agree that this comment was what prompted Petitioner and Z.P. to act.

Z.P. agreed that A.M. "couldn't walk or stand up" when he carried her to the back room. According to Z.P., they laid A.M. on the floor, and Petitioner undressed her. Petitioner then—according to Z.P.—put his finger in A.M.'s vagina, performed oral sex on her, and attempted to penetrate her with his penis. Z.P. could not say whether Petitioner

---

[5] Z.P. testified that both he and Petitioner "stated" this.

[6] Seconds later, Z.P. was sure about this detail: "She was just saying, f— me[.]"

"penetrated or not because he just pulled back." Z.P. testified that, when Petitioner pulled up his pants, he "told [J.M] to give it a go[;] . . . come on, it's your turn." J.M. penetrated A.M. with his penis. While all this was going on, Z.P. was in the room "[j]ust watching." Z.P. professed remorse for his conduct, observing that "[w]hether she told us to have sex with her or not, she was not in the state to have this done."

On cross-examination, Petitioner's counsel revealed several additional inconsistencies between Z.P.'s trial testimony and his statements to the police. Z.P. confessed that he had been untruthful with the police.

**Petitioner's Recorded Statement**

Petitioner's statement to the police was recorded on video, and the State played the video as part of its case in chief. Petitioner admitted that he bought "two bottles" of alcohol with $20 that he received from S.R. Petitioner said that A.M. was present and did a "line" of "hydros[.]" Everyone was drinking.

Sometime after that, A.M. and J.K. walked to the back room to have sexual relations. According to Petitioner, "[W]e knew about it because we could hear them[.]" "She got into this weird mode where she is moaning and . . . writhing and just . . . being weird." The sounds continued after J.K. left the back room, and A.M. eventually returned to the living room.

According to Petitioner, A.M.'s "weird stuff" continued, and he approached her on the couch to see if she was okay. He stated that A.M. "reaches up and grabs me and tries to attack me." Petitioner said that he "grabbed her and . . . put her back on the

8

couch[.]" Others told him to "[s]tay away[.]" Petitioner advised J.K. that A.M. was "freaking out" and that he "need[ed] to go and take care of this." So, according to Petitioner, J.K. and A.M. returned to the back room to have sex.

Petitioner stated that he went to the back room sometime later. He found A.M. on the floor "[f]ully clothed" and "making all this noise and stuff[.]" At that point, he was called away by the arrival of his "baby's mother" and went across the street for a while. When he returned, A.M. was "rolling around" on the floor in the living room with a cut on her face. Petitioner insisted that A.M. be taken to the hospital, and he carried her "fireman style" to the vehicle.

The police officer challenged Petitioner's account, and it began to change. Petitioner said that he went to the back room twice—once when J.K. was having sex with A.M. and once when J.K. had left the room. When Petitioner went to the back room the second time, he went with Z.P. and J.M. However, Petitioner was "just checking on her." "Nothing happened[,] . . . not while I was in the room, nothing." Petitioner later changed his version of events. Soon he admitted that "[J.M.] f—ed her and [Z.P.] stuck his [penis] in her mouth[,]" but Petitioner "didn't do anything." He also denied "smacking" A.M.'s buttocks when they were on the couch. He admitted to touching "her back and stuff to try to chill her out" and to throwing her on the couch when she tried to "attack" him, but said he was not "being mean about it."

9

He continued to deny carrying A.M. to the back room or sexually assaulting her, and he offered to provide a DNA "sample right now."[7] Later he said, "I don't remember carrying her into the back room, but if I did, it was only to lay her down. But she was laying down on the couch, so I don't know why I would carry her there."[8]

When the police officer accused Petitioner of encouraging the other young men, he replied, "Yeah. I said to woo her, man. You don't take advantage of them, but you can woo them." "As a dude, if you go back there, I'm telling you that you can probably get with her tonight if you just lay with her."

The police officer eventually left the interview room, and Petitioner phoned his mother.[9] Describing what he told the officer, Petitioner said, "I told him that I did give [J.M.] . . . the encouragement to go back there and to f— her and everything and that stuff. I said that. I said, '[J.M.], you can f—ing go back there and get it.'"

---

[7] At trial, expert testimony established that a mixture of DNA from J.M. and J.K. was recovered from A.M.'s body. Petitioner's DNA, however, was not present in any of the samples analyzed by the State Police.

[8] Later his position shifted still further: "If I carried her back to the room, I might have done that only (Indistinguishable words) but I didn't carry her back there for . . . anything else to happen."

[9] The video camera evidently remained on and continued to record what transpired in the interview room. No objection to this portion of the video appears in the record.

**Jury Instructions**

The parties proposed jury instructions before trial and discussed them with the court over the course of the trial. Sexual abuse in the first degree[10] and battery[11] were proposed as lesser included offenses under count one of the indictment. However, as of the end of the second day of trial, Petitioner's attorney was still not sure whether he wanted the jury to be given the battery instruction. The State objected to a battery instruction, and the court said that it would "wait to hear the rest of the evidence[.]"

This matter came up again early on the third day of trial, before the State had rested. Petitioner's attorney argued that battery is an "offensive touching" and that "[a]ny

---

[10] W. Va. Code § 61-8B-7(a) (2006) provides that "[a] person is guilty of sexual abuse in the first degree when . . . (2) [s]uch person subjects another person to sexual contact who is physically helpless[.]"

[11] W. Va. Code § 61-2-9(c) (2017) defines battery as "unlawfully and intentionally mak[ing] physical contact of an insulting or provoking nature to the person of another or unlawfully and intentionally caus[ing] physical harm to another person[.]" We would note, however, that the statute was different when Petitioner committed his battery. The earlier version defined battery as "unlawfully and intentionally mak[ing] physical contact with force capable of causing physical pain or injury to the person of another or unlawfully and intentionally caus[ing] physical pain or injury to another person[.]" W. Va. Code § 61-2-9(c) (2014). In their discussions about instructions, both the parties and the court assumed that the newer version of the statute applied, and the jury was instructed accordingly. No one has raised this issue on appeal, however, and Petitioner invited this error and benefitted from it. Syl. Pt. 6, in part, *Lewis v. Ames*, ___ W. Va. ___, 836 S.E.2d 56 (2019) ("A criminal defendant cannot invite the circuit court to give an erroneous instruction on a lesser included offense, benefit from that instruction, and then complain on appeal, or in a collateral attack, that such instruction should not have been given."); *State v. Shearer*, No. 16-1209, 2018 WL 1659488, at *3 (W. Va. Apr. 6, 2018) (memorandum decision) ("It is apparent that petitioner reviewed the charge and assured the trial court that he was satisfied with its contents and had no objection. Therefore, petitioner knowingly and intentionally waived any right to have the jury differently instructed.").

11

sexual assault is by nature probably carry[ing] that same element of an offensive touching." He also noted evidence that Petitioner "smacked [A.M.] on the butt" and "pushed her back on the couch" and observed that Z.P. was pleading to battery. The State agreed that a person who sexually assaults a physically helpless person also commits battery but denied that any "evidentiary conflict" warranted a battery instruction. According to the State, there was no "reason to believe anything other than a sexual assault occurred." Petitioner's counsel replied that sexual abuse in the first degree requires "sexual contact, . . . an offensive touching but done . . . for purposes of sexual gratification." He argued that a battery conviction might be warranted if the jury believed that Petitioner smacked, grabbed, and pushed A.M. on the couch but not for his sexual gratification. After hearing the parties' arguments, the circuit court remained undecided.

That afternoon, when both sides had rested, the circuit court rendered its decision. The circuit court determined that a battery instruction was necessary, reasoning that "[w]e do have a dispute . . . about whether the State has conclusively proven the greater offense."[12] The court instructed the jury that it could reach one of four verdicts on count one of the indictment: "guilty of sexual assault in the second degree, guilty of sexual abuse in the first degree, guilty of battery or not guilty." The court further instructed that the jury could convict Petitioner if they found that he perpetrated these crimes himself or aided and abetted the perpetrator. On these instructions, the jury found Petitioner not guilty of sexual

---

[12] The circuit court based its decision on *State v. Neider*, 170 W. Va. 662, 295 S.E.2d 902 (1982).

12

assault in the second degree, not guilty of sexual abuse in the first degree, and guilty of battery. The jury could not reach a verdict on the conspiracy count.[13]

**Sentencing**

On June 14, 2018, the State filed a written motion asking the circuit court to find that Petitioner's battery offense was sexually motivated and to require Petitioner to register as a sex offender. Petitioner filed a response on June 21, 2018, opposing the State's motion. Petitioner argued, among other things, that he "contested and opposed a finding of sexual motivation[—]i.e. two separate sexual assault/abuse allegations[—]at trial and prevailed" and that it was "unclear" which conduct led to Petitioner's battery conviction. He also objected, based on our decisions in *State v. Whalen*, 214 W. Va. 299, 588 S.E.2d 677 (2003) and *State v. Seen*, 235 W. Va. 174, 772 S.E.2d 359 (2015),[14] that he received no pre-trial notice that the State intended to seek a finding of sexual motivation.

---

[13] This count was later dismissed with prejudice upon the State's motion.

[14] In Syllabus Point 1 of *Whalen*, we held that

> [i]n order for a sentencing judge to make a finding pursuant to *W.Va.Code,* 15–12–2(c) [2001] that a defendant who has been convicted of a criminal offense that is not specifically identified in the Sex Off[ender] Registration Act at *W.Va.Code,* 15–12–2(b) [2001]—after a trial or by means of a plea of guilty or *nolo contendere*—was "sexually motivated" in the commission of that offense, the defendant must have been advised prior to trial or the entry of a plea of the possibility of such a finding.

We quoted this holding (mostly verbatim) in Syllabus Point 3 of *Seen*.

Petitioner appeared for sentencing on September 14, 2018. The circuit court imposed the maximum penalty of twelve months in jail[15] plus a $500 fine. After hearing from the parties and the victim's father, the circuit court found beyond a reasonable doubt that Petitioner's battery was sexually motivated and directed Petitioner to register as a sex offender.

The court put this finding in a written order entered on September 19, 2018. According to the order, Petitioner "had actual notice to defend against a sexual charge . . . and clearly understood that he had to defend against the allegation that his motives were sexual in nature." He also "had notice that if convicted, he would have to register as a sex offender." On top of this, it was Petitioner who requested the court's battery instruction. The court distinguished our holdings in *Whalen* and *Seen*, noting that neither of these cases involved a sex offense charge that was tried before a jury.

As support for its conclusion that Petitioner's battery was sexually motivated, the court noted, among other things, Petitioner's own statements encouraging J.M. to have sex with A.M. and evidence that Petitioner helped carry the "obviously impaired" victim to the back room where Petitioner "encouraged [J.M.] to have sex with her." The court further noted the intoxicating substances found in the victim's system, Petitioner's role in purchasing alcohol, and Petitioner's relative age[16] in comparison to the victim and the "other teenage witnesses[.]"

---

[15] Petitioner's credit for time served exceeded twelve months.
[16] Petitioner was 21 years old when he committed the offense.

14

Petitioner appeals from the circuit court's September 19, 2018 order.

## II. STANDARD OF REVIEW

Our standard of review is as follows:

> "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997).

Syl. Pt. 2, *State v. Hinchman*, 214 W. Va. 624, 591 S.E.2d 182 (2003).

## III. ANALYSIS

On appeal, Petitioner contends that the circuit court abused its discretion and erred when it found that Petitioner's battery was sexually motivated. In particular, Petitioner argues (a) that the circuit court wrongly assumed that Petitioner's battery was carrying the victim to the back room, (b) that the circuit court's finding of sexual motivation is at odds with the jurors' verdict, and (c) that the State provided untimely notice of its intent to seek a finding of sexual motivation.

### A. Conduct Establishing Sexual Motivation

According to W. Va. Code § 15-12-2(c), a defendant's obligation to register as a sex offender turns, first, on whether he "has been convicted of a criminal offense" and, second, on whether "the sentencing judge made a written finding that the offense was

15

sexually motivated[.]"[17]  An offense is sexually motivated when "one of the purposes for which a person committed the crime was for any person's sexual gratification."  W. Va. Code § 15-12-2(j).

In this case, the circuit court determined that Petitioner committed battery when he carried A.M. to the back room.  However, the State's witnesses actually described several instances where Petitioner's conduct could be described as "unlawfully and intentionally mak[ing] physical contact of an insulting or provoking nature to the person of another[.]"  W. Va. Code § 61-2-9(c).[18]  For example, Petitioner allegedly touched the victim's breasts and buttocks when she was on the couch.  By his own admission, he also threw her on the couch when she "attacked" him.  Petitioner contends that the circuit court was wrong to single out one alleged instance of battery as the basis for its sexual motivation finding.

Petitioner's argument ignores two facts.  First, the jurors did not tell the circuit court the nature of the battery that led to Petitioner's conviction.  Therefore, it was *necessarily* up to the circuit court to identify the conduct that was sexually motivated under W. Va. Code § 15-12-2(c).  Accordingly, we hold that when a sentencing court makes a written finding of sexual motivation under W. Va. Code § 15-12-2(c), the sentencing court

---

[17] The standard set forth in W. Va. Code § 15-12-2(c) only applies when the defendant's criminal offense is not listed among the offenses—like sexual assault—that lead to automatic registration.  *See* W. Va. Code § 15-12-2(b).  Battery is not a listed offense that results in automatic registration.

[18] *See supra* note 11.

has the discretion to determine that the particular misconduct that led to the defendant's conviction exhibited sexual motivation, and we will not disturb this determination on appeal unless the sentencing court abuses its discretion.

This brings us to the second relevant fact, which is that, in this instance, Petitioner was convicted of battery as a lesser included offense of sexual assault in the second degree. This is appropriate when "the primary offense . . . [is] fully and plainly charged in the indictment, such that a defendant . . . [is] on notice to mount a defense to both the primary offenses and any lesser-included offense." *State v. Corra*, 223 W. Va. 573, 583, 678 S.E.2d 306, 316 (2009), *holding modified by Lewis v. Ames*, ___ W. Va. ___, 836 S.E.2d 56 (2019).

When we review a circuit court's decision to instruct a jury on a lesser included offense, we typically focus on two things. "The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense." *State v. Neider*, 170 W. Va. 662, 664, 295 S.E.2d 902, 904 (1982). "The second inquiry is a factual one which involves a determination by the trial court if there is evidence which would tend to prove such lesser included offense." *Id.* at 665, 295 S.E.2d at 905.

There was testimony that Petitioner had sexual intercourse with A.M. in the back room, and "sexual intercourse with A.M." was the conduct charged in the indictment. The circuit court apparently determined that Petitioner committed battery when he *carried*

17

A.M. to the back room, and we find no abuse of discretion in such finding. As the circuit court found,

> 1) The [Petitioner]'s own audio statement to the police proves sexual motivation beyond a reasonable doubt. The [Petitioner] admitted to the police that he gave [J.M.] (a minor) the encouragement to have sex with the victim as long as she was awake. . . .
>
> 2) The Defendant also made admissions to the police that he told [J.M.] that "if she was awake you can go for it"; . . . and that "she wants anybody right now."
>
> 3) The . . . testimony of three different witnesses, [B.S.], [A.G.], and [Z.P.], proves beyond a reasonable doubt that the [Petitioner]'s action were sexually motivated. All three witnesses testified at trial that the [Petitioner] helped carry the victim's limp body into a back bedroom where she was sexually assaulted.
>
> 4) In addition, . . . the victim was highly intoxicated and obviously impaired at the time that the [Petitioner] helped carry her to the bedroom and encouraged [J.M.] to have sex with her. . . .
>
> 5) The evidence at trial also proved beyond a reasonable doubt that the [Petitioner], who was over the age of 21, purchased the alcohol consumed by the victim and others prior to the sexual assault. The victim was 16 years old, the perpetrators and other teenage witnesses were 18 or under the age of 18 at the time of the events.

The conduct that the circuit court identified directly contributed to the crime alleged in the indictment and may be properly described as part of the same alleged criminal transaction. Accordingly, we find that the circuit court was within its discretion to determine that this misconduct was the relevant misconduct for purposes of its finding of sexual motivation.

18

## B. Interpreting the Verdict

Petitioner also contends that the circuit court's finding of sexual motivation is at odds with the jurors' verdict. According to Petitioner, he "contested and opposed a finding of sexual motivation" and he "prevailed when the jury failed to find that . . . [he] committed either [sexual assault or sexual abuse] beyond a reasonable doubt." We disagree.

The court instructed the jury that it could return a verdict of sexual abuse in the first degree as a lesser included offense. A person commits sexual abuse in the first degree when he "subjects another person to sexual contact who is physically helpless[.]" W. Va. Code § 61-8B-7(a)(2) (2006). "Sexual contact" is

> any intentional touching, either directly or through clothing, of the breasts, buttocks, anus or any part of the sex organs of another person, or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done *for the purpose of gratifying the sexual desire of either party*.

W. Va. Code § 61-8B-1(6) (emphasis added). Sexual gratification was, thus, an express element of one of the crimes considered by the jury. Moreover—and as Petitioner correctly observes—jurors were instructed that they could find Petitioner guilty on either of two theories: first, that he, himself, subjected the victim to sexual contact or, second, that he aided and abetted another person who subjected the victim to sexual contact. Thus, the question of *any person's* sexual gratification was before the jury, not just the question of Petitioner's own sexual gratification or that of the victim. This was the same issue before the sentencing judge pursuant to W. Va. Code § 15-12-2(j): "'sexually motivated' means

19

that one of the purposes for which a person committed the crime was for any person's sexual gratification."[19]

We cannot agree, however, with Petitioner's premise that he *prevailed* on the issue of sexual motivation. Petitioner believes that his acquittals on the charges of sexual assault in the second degree and sexual abuse in the first degree mean that the jury agreed with his view of the evidence and that, therefore, the State was somehow estopped from arguing at sentencing that his battery was sexually motivated.[20] We have held that "[t]he principle of collateral estoppel applies in a criminal case where an issue of ultimate fact has once been determined by a valid and final judgment. In such case, that issue may not again be litigated between the State and the defendant. *Ashe v. Swenson,* 397 U.S. 436, 90

---

[19] In reaching this conclusion, we affirm the circuit court's written finding that Petitioner "had actual notice to defend against a sexual charge . . . and clearly understood that he had to defend against the allegation that his motives were sexual in nature."

[20] We assume this because Petitioner refers us to *United States v. Watts*, 519 U.S. 148, 156, 117 S. Ct. 633, 637, 136 L. Ed. 2d 554 (1997) and its holding that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id*. (quoting *Dowling v. United States,* 493 U.S. 342, 349, 110 S.Ct. 668, 672, 107 L.Ed.2d 708 (1990)). *Dowling* discussed and applied *Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970), which elevated the doctrine of collateral estoppel in criminal cases to a principle of federal constitutional law. *Ashe*, 397 U.S. at 445, 90 S. Ct. at 1195, 25 L. Ed. 2d 469. Petitioner believes, in particular, that the State may not relitigate an issue *unless* the standard of proof is lower for the second litigation. This argument—if correct—might warrant reversal, because we have held that "[t]he evidentiary standard for a finding of 'sexual motivation' pursuant to *W.Va.Code,* 15–12–2(c) [2001] is proof beyond a reasonable doubt[.]" Syl. Pt. 2, in part, *State v. Whalen*, 214 W. Va. 299, 588 S.E.2d 677 (2003). On the facts of this case, however, no reversal is warranted, because the jurors' verdicts cannot be said to have "determined" whether Petitioner's battery was sexually motivated. Furthermore, because the jurors did not decide this issue, Petitioner has no ground to suggest that the circuit court based its decision on evidence that the jurors rejected.

20

S.Ct. 1189, 25 L.Ed.2d 469 (1970)." Syl. Pt. 1, *State v. Porter*, 182 W. Va. 776, 392 S.E.2d 216 (1990).

However, when, as here, the question is not a subsequent trial on an offense but instead a matter at sentencing, an acquittal of specific charges which include sexual motivation does not estop the court from determining whether Petitioner's actions for which he was convicted were, in fact, sexually motivated pursuant to the statute requiring registration as a sex offender. We have held that

> [i]n determining whether collateral estoppel bars retrial of a defendant following a trial where a jury acquitted the defendant on one or more charges, but deadlocked on other charges, a court must examine the record of the prior proceeding, taking into account the pleadings, evidence, jury charge, and all other relevant matter, and conclude *whether a rational jury could have grounded its verdict of acquittal upon an issue other than the issue which the defendant seeks to bar from reprosecution.*

Syl. Pt. 4, *State ex rel. Taylor v. Janes*, 225 W. Va. 329, 693 S.E.2d 82 (2010) (emphasis added).

After careful review of the record, we find that "a rational jury could have grounded its verdict of acquittal" on the charges of second degree sexual assault and first degree sexual abuse "upon an issue other than" a finding that the Petitioner's actions were not sexually motivated. Syl. Pt. 4, in part, *Taylor*, 225 W. Va. 329, 693 S.E.2d 82.[21]

---

[21] Following precedent, we attach no significance to the jurors' inability to reach a verdict on the conspiracy count. *See* Syl. Pt. 5, in part, *Taylor*, 225 W. Va. 329, 693 S.E.2d 82 ("[C]ourts are not to consider [a] deadlocked charge in deciding whether collateral estoppel

(continued . . .)

Simply put, the jury may very well have believed that Petitioner's actions were sexually motivated and at the same time have believed that battery was the appropriate charge of which to convict Petitioner. The two are not mutually exclusive. Therefore, while we agree that testimony touching on sexual motivation was before the jury, we cannot agree that Petitioner's sexual abuse (or sexual assault) acquittal barred the circuit court from making is own independent, statutory determination that Petitioner's battery was sexually motivated. As we have said, "West Virginia Code § 15–12–2(c) places the responsibility for determining the sexual nature of criminal motivation squarely in the hands of the sentencing judge." *State v. Shearer*, No. 16-1209, 2018 WL 1659488, at *3 (W. Va. Apr. 6, 2018) (memorandum decision). Here, the circuit judge did not abuse her discretion in finding that Petitioner's actions were sexually motivated.

### C. Notice to Defend

Finally, Petitioner objects that the State provided untimely notice of its intent to seek a finding of sexual motivation. We have held that

> [i]n order for a sentencing judge to make a finding pursuant to *W.Va.Code,* 15–12–2(c) [2001] that a defendant who has been convicted of a criminal offense that is not specifically identified in the Sex Off[ender] Registration Act at *W.Va.Code,* 15–12–2(b) [2001]—after a trial or by means of a plea of guilty or *nolo contendere*—was "sexually motivated" in the commission of that offense, *the defendant must have*

bars the defendant's retrial."); *Yeager v. United States*, 557 U.S. 110, 121–22, 129 S. Ct. 2360, 2368, 174 L. Ed. 2d 78 (2009) ("To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." (footnote omitted)).

> *been advised prior to trial or the entry of a plea of the*
> *possibility of such a finding.*

Syl. Pt. 1, *State v. Whalen*, 214 W. Va. 299, 588 S.E.2d 677 (2003) (emphasis added).

Petitioner contends that our holding in *Whalen* requires us to reverse the circuit court because he did not receive notice that the State would seek a finding of sexual motivation before trial. We disagree.

When a defendant faces a potential finding of sexual motivation under W. Va. Code § 15-12-2(c), due process means, at a minimum, that the defendant has "the opportunity to oppose and contest such a proposed finding with evidence and argument." Syl. Pt. 2, in part, *Whalen*, 214 W. Va. 299, 588 S.E.2d 677. This requirement is also clear from our holding in *State v. Seen*, 235 W. Va. 174, 772 S.E.2d 359 (2015). In *Seen*, a physician was charged with battery against an elderly patient. *Id*. at 177-178, 772 S.E.2d at 362-363. The State believed that this battery was sexually motivated, but the State did not declare its intent to seek a finding of sexual motivation until its opening statement. *Id*. at 178-179, 772 S.E.2d at 363-364. When the circuit court found the physician guilty and found that his battery was sexually motivated, the physician appealed, arguing that if only the State had given him pretrial notice, "he could have presented evidence to rebut the issue of sexual motivation and would have considered utilizing expert evidence to prove he was not attracted to men and that he would not receive sexual gratification from kissing a man." *Id*. at 181-182, 772 S.E.2d at 366-367.

We agreed with the physician and found that the State's "error affected the petitioner's substantial rights and prejudiced him by severely limiting his ability to prepare

23

a defense at trial." *Id*. at 182, 772 S.E.2d at 367. It also "seriously affected the fairness of the judicial proceedings[.]" *Id*. This error was not harmless, because the physician's "trial strategy would have been altered drastically if he had known he had to defend against the contention that the act was sexually motivated." *Id*.

In *Seen*, the defendant was denied pretrial notice which was essential for him to effectively defend the charge and, thus, to receive due process. We cannot say, however, that additional specific notice was necessary for Petitioner to receive due process in this case. Based on the crime of which he was indicted, Petitioner clearly knew that the conduct of which he was accused subjected him to a finding of sexual motivation. Petitioner actually contested the issue of sexual motivation at trial, and, though, he objects to the State's lack of pretrial notice, he has never identified a single thing that he would have done differently if the State had expressly stated prior to trial its intent to seek a finding of sexual gratification under W. Va. Code § 15-12-2(c).[22]

In addition, Petitioner, himself, bears much of the burden for the alleged deficiency of notice of which he now complains. As late as day two of the trial, Petitioner's

---

[22] Petitioner offers us, at most, the vague assurance that if the State had "provided such notice, the Petitioner would have been afforded the opportunity to contest the State's evidentiary burden related to the only non-sexually motivated crime presented to the petit jury." We are not persuaded. Petitioner's counsel's arguments for a battery instruction show that he believed Petitioner had an incentive to contest sexual motivation in the context of battery: "[I]f the jury finds [B.S.]'s testimony about [Petitioner] slapping [A.M.] on the rear end or grabbing her breast, but not done so in a manner for sexual gratification but rather as a response is [sic] what [B.S.] said was that she was yelling the word, eff me, eff me, grabbing his genitalia, and if [Petitioner] did smack her or push her back, that is an offensive touching. There has been no evidence that was done for sexual gratification. So by definition that is a battery."

counsel remained unsure whether he wanted the Court to give a battery instruction. The State, by contrast, opposed the battery instruction at every turn. The State cannot be expected to provide express pretrial notification relating to a crime it did not know the jury would have as an alternative until trial. As to the crime charged in the indictment, such crime fell within the scope of W. Va. Code § 15-12-2(b), which automatically requires registration as a sexual offender, and, thus, Petitioner was certainly on notice that, if convicted, he would be required to register as a sex offender. The State cannot reasonably be required to expressly notify Petitioner, prior to trial, that it would seek a finding of sexual motivation if Petitioner was convicted of an offense not contained in the indictment. This is particularly true here since Petitioner was unsure if he wished to seek an instruction on such lesser included offense until after the trial had commenced.

Accordingly, we find that, on the unique circumstances of this case, pretrial notice that the State would seek a finding of sexual motivation if Petitioner was convicted of battery was not necessary for Petitioner to receive due process of law. Therefore, the circuit neither abused its discretion nor erred when it found that Petitioner's offense was sexually motivated.

## IV. CONCLUSION

For the foregoing reasons, we affirm the September 19, 2018 order of the Circuit Court of Jefferson County determining that Petitioner's offense was sexually motivated.

Affirmed.